**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------x
**UNITED STATES EX REL. DENISE ROMANO,**

                **Plaintiff,**                00 Civ. 8792 (LLS)

    v.

                                          **OPINION and ORDER**

**NEW YORK PRESBYTERIAN: THE UNIVERSITY**
**HOSPITALS OF COLUMBIA AND CORNELL,**

                **Defendant.**
------------------------------------x

    This qui tam suit arises out of Relator's claim that New York-Presbyterian Hospital[1] ("the Hospital") is liable for civil penalties, for its complicity in false Medicaid bills that were submitted by Columbia University for services performed at the Allen Pavilion.

    The Allen Pavilion is a medical center owned and operated by the Hospital. The Allen Pavilion provides a range of medical services including obstetric and gynecologic care. Part of its staff is furnished by the Hospital, which provides support and professional personnel including certified nurse midwives ("CNMs"); the rest is furnished by Columbia University, which provides support personnel and health care providers, including physicians from Columbia's Obstetrics and Gynecology Department.

    Columbia physicians providing services to Medicaid-eligible patients at the Allen Pavilion are entitled to reimbursement

---

[1] On December 31, 1997, Columbia Presbyterian Hospital (which included the Allen Pavilion) merged into New York Hospital, creating New York-Presbyterian Hospital.

from the New York Medicaid Program on a fee-for-service basis. When submitting a bill for Medicaid reimbursement, the provider must certify that the services listed on the form were personally furnished by the provider or the provider's employee under the provider's personal direction. The claims in this case arise from Allen Pavilion physicians certifying they performed or supervised obstetric services which in fact were performed in their absence by midwives.

In 2000, Denise Romano,[2] the Relator, filed this suit pursuant to the qui tam provisions of 31 U.S.C. § 3729, et seq., against Columbia University and the Hospital,[3] alleging that Columbia, with the participation of the Hospital, had fraudulently billed Medicaid for services that were not furnished by the billing provider. Pursuant to 31 U.S.C. § 3730, the United States investigated Relator's claims, intervened against Columbia and settled the claims against it for $5,100,000, and declined to intervene against the Hospital. Relator then filed an amended complaint against the Hospital, followed by a second amended complaint on September 30, 2003.

---

[2] Ms. Romano was a Columbia University employee who from February 1999 through May 2001 was assigned to the Allen Pavilion as a Teaching Service Billing Compliance Associate.
[3] The original complaint also named Rogerio Lobo, M.D., Juanita Jenyons, M.D. and Terence Davidson. Relator voluntarily dismissed the claims against all three after the United States settled with Columbia.

## The Issues

The Hospital and Relator have stipulated that Columbia falsely billed the Medicaid program for physician services which were not provided by the physicians at the Allen Pavilion.[4] The issues in this case concern the role, if any, that the Hospital played in the false billings.

Relator contends that the Hospital participated in the fraud in violation of the first three subsections of the False Claims Act, which impose liability on any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]
>
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

31 U.S.C. § 3729(a).

Specifically, Relator argues that the Hospital conspired with Columbia in fraudulently billing Medicaid for services the Hospital's midwives (CNMs) provided, and that the Hospital repeatedly tried to collect from Columbia some or all of the reimbursements which Columbia was fraudulently obtaining. Implementing the conspiracy, doctors at the Allen Pavilion were instructed to falsify medical charts by inserting notes

---
[4] July 13, 2005 Joint Pre-Trial Order, Agreed Findings of Fact ¶ 13.

-3-

indicating that they (as well as the midwife) had participated in delivering babies, to make the charts billable to Medicaid in the doctor's name. Many of the deliveries thus falsely billed were actually performed by the Hospital CNMs. Relator contends that the orders to falsify medical charts were given by Dr. Rogerio Lobo and Dr. Juanita Jenyons, the two doctors who oversaw the OB/GYN activities at the Allen Pavilion.

As a critical element in her claim against the Hospital, Relator contends that Dr. Lobo and Dr. Jenyons were employees of the Hospital, making the Hospital liable for their actions.

The Hospital argues that it never conspired or agreed with Columbia to render false bills to Medicaid, that the fraudulent billing scheme was initiated and carried out entirely by Columbia University without any involvement by the Hospital. The Hospital maintains that the doctors and administrators who participated in the fraudulent billing were employees of Columbia, not the Hospital.

The parties also present the question whether, if the Hospital is found to have otherwise violated the False Claims Act, it must pay civil penalties even if the United States suffered no damages.

Procedurally, these issues are raised by the Hospital's motion for summary judgment dismissing the action, and Relator's motion for partial summary judgment ruling that the Hospital

must pay a statutory civil penalty for each false claim for which the Hospital is held liable, even if the United States suffered no monetary damage from the filing of that claim.

## Discussion

A motion for summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail on a motion for summary judgment, the moving party must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986). The burden is then on the non-moving party to set forth specific facts raising a genuine issue of fact for trial. Id. at 324, 106 S.Ct. at 2553. "All reasonable inferences and any ambiguities are drawn in favor of the nonmoving party." Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990).

1.

Because of the evidence that Dr. Jenyons and Dr. Lobo ordered the Allen Pavilion attending physicians to make false entries on the charts, (October 26, 2005 Affirmation of Philip

-5-

R. Michael, Volume II, Exhibits 65, 67, 74, and 84), it is critical to the Hospital's success on its motion to establish as a matter of law that Dr. Jenyons and Dr. Lobo were not employees or agents of the Hospital.

In determining whether a hired party is an employee, the court considers many factors including:

> the hiring party's right to control the manner and means by which the product is accomplished. . . . the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52, 109 S.Ct. 2166, 2178-79 (1989)(footnotes omitted). See also Restatement (Second) of Agency § 220(2) (outlining similar factors). "No one of these factors is determinative." Community for Creative Non-Violence, 490 U.S. at 752, 109 S.Ct. at 2179.

The evidence the hospital offers to support its assertion that Drs. Jenyons and Lobo were not its employees is the July 13, 2005 Affidavit of Charles Cain, M.D. ("Cain Aff."), Medical Director of the Allen Pavilion from February 1999 until February

2005. Dr. Cain's affidavit does not even mention Dr. Jenyons or Dr. Lobo. It deals entirely with the Hospital's relationship with attending physicians at the Allen Pavilion and their supporting administrators. It was to those attending physicians that Dr. Jenyons and Dr. Lobo allegedly issued their orders. The status of the attending physicians sheds no light upon the status of Dr. Jenyons or Dr. Lobo. Thus, Dr. Cain's affidavit fails to carry the weight the Hospital assigns to it.

Dr. Lobo's responsibilities included oversight of the OB/GYN activities at the Allen Pavilion. Dr. Jenyons was his representative at the Allen Pavilion and oversaw all clinical activities there, including direct supervision of all the attending physicians and midwives. The responsibilities and job descriptions of these two individuals at the helm of the Allen Pavilion's obstetrics and gynecology practice extend beyond those of attending physicians and administrative support staff.

Dr. Lobo's hiring letter was signed by high ranking officials from Columbia University and the Hospital and indicates that both officials met with Dr. Lobo and discussed numerous aspects of his employment, including his job description and compensation (Michael Aff., Vol. II, Exhibit 5). Similarly the Chief of Obstetrics (a position ultimately filled by Dr. Jenyons) was to be jointly recruited by Dr. Lobo and the Hospital. (Id., Exhibit 6). The hiring letter of Dr. Lobo makes

clear that the Hospital was paying a specific sum for his salary. Michael Aff., Vol. II, Exhibit 5 ("Your compensation will work in the following way: the School and the Hospital will provide you with a combined institutional base salary of $150,000 ($75,000 each)."). The Hospital also agreed to increase Dr. Jenyon's proposed compensation by $72,000, contingent on specific expectations. (Id., Exhibit 39). The final hiring letter for Dr. Jenyons also indicates that she had more than one conversation with Elaine Berg, a Hospital official,[5] concerning her compensation. (Id., Exhibit 39). In 1998 Dr. Jenyons was given an additional $80,000 in compensation, to be paid by the Hospital and linked to "a target of 200 admissions that Dr. Jenyons will bring to the Allen Pavilion during the period of January 1 to December 31, 1998. . . . If she admits less than the targeted 200 admissions, her $80,000 compensation will be prorated in proportion to the actual number of cases she admits during this calendar year." Michael Aff., Vol. II, Exhibit 59. There is ample evidence to raise a genuine issue of fact about whether Dr. Jenyons and Dr. Lobo were Hospital employees.

---

[5] Ms. Berg held at least two positions at the Hospital, including Vice President of Community Health and Executive Director of the Allen Pavilion.

2.

The Hospital argues that Relator cannot prove the existence of an agreement between the Hospital and Columbia concerning billing for midwife services, saying that in fact the Hospital "specifically requested that Columbia cease billing for such services." September 20, 2005 Defendant Mem. at 15 (citing Exhibits 95 and 97). It appears the Hospital did not make that request until June 1999 (Michael Aff., Vol. II, Exhibit 97), although it had known about the practice since May 1996 (Id., Exhibit 20). Relator contends an agreement can be inferred from the fact that top level Hospital officials knew for years about Columbia's fraudulent billing practices, as shown by numerous documents. See, e.g. id., Exhibit 24 at 2 ("The Hospital receives no reimbursement for midwife services while the OB/GYN Department bills a professional fee for midwife services."); See also id., Exhibits 20 and 22.

Documents concerning a different but questionable billing practice (possibly obtaining overlapping reimbursement from Medicaid on the basis of "cost reports")[6] support an inference that the Hospital was not only aware of Columbia's fraudulent billing, but repeatedly tried to benefit from it by obtaining a share (or all) of the proceeds. The Hospital concedes that "there were a number of instances in which the Hospital

---

[6] The hospital had been told in 1996 that this practice was fraudulent. See Michael Aff., Vol. II, Exhibits 22 and 34.

discussed the issue of possible reimbursements for midwife services from Columbia University, and even created accounts to record the deficit that the Hospital was incurring on a monthly basis." Def. Mem. at 9. Such "possible reimbursement" proposals included crediting the Hospital with the amount of the services billed, or reducing the amount of financial support the Hospital gave to Columbia to reflect the money Columbia was obtaining. See, e.g. Michael Aff., Vol. II, Exhibit 20, a midwife billing proposal stating: "The Hospital receives no reimbursement for midwife services, while it is our understanding that the Department of Ob/Gyn is able to bill a professional fee for midwife services," with a handwritten note at the bottom stating: "Harold [the Hospital's Executive Vice-President and Chief Financial Officer] would like to say directly that we will receive all of their collections."; id., Exhibit 23 ("Harold would prefer that we simply say that they should turn over all of their professional collections related to these patients."); id., Exhibit 24 at 2 ("The Department should be responsible for all costs related to the midwives and the attending physicians for which it bills the professional component. This represents a total reduction of support from the Hospital to the Department of approximately $1.9 million."). See also id., Exhibits 62 at 2 and 77.

This showing is enough to raise a triable issue of fact

about whether there was an agreement between the two entities, amounting in law to an offense under 31 U.S.C. § 3729(a)(3) which imposes liability on one who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid."

3.

The False Claims Act provides that any person who violates 31 U.S.C. §§ 3729(a)(1) – (7) is liable for "a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person."[7] 31 U.S.C. § 3729(a).

The parties debate a question which is open in the Second Circuit (See United States ex rel. Mikes v. Straus, 274 F.3d 687, (2d Cir. 2001)). That is whether, since the statute defining the offense refers to "damages," the false billing's "damage" to the government is an element of the offense. If so, the argument runs, without damage to the government there is no offense, and therefore no claim for the civil fine which would otherwise be recoverable and independent of how much damage the government sustained. On this point, the authorities are somewhat in conflict.

That question does not arise here. In this case the

---

[7] In 1999, the minimum and maximum penalties were increased to $5,500 and $11,000 respectively. See 28 C.F.R. 85.3(a)(9).

infliction of damage on the government is obvious. As the parties stipulated in their Joint Pre-Trial Order, "The Medicaid program was falsely billed for Columbia physician services which, in fact, had not been provided by the physicians and a reimbursement with penalties was paid by Columbia to the United States." July 13, 2005 Joint Pre-Trial Order, Agreed Findings of Fact ¶ 13. Although the Hospital argues that Columbia's settlement satisfied the government's claim of damages in full and so left the case with no remaining claim for "damages" to establish that element of the offense, it is perfectly clear that for all the time between payment of the allegedly fraudulent bills and the ultimate restoration of its funds through an extended legal proceeding, the government had suffered damages.

The principle is illustrated by <u>Young-Montenay, Inc. v. United States</u>, 15 F.3d 1040 (Fed. Cir. 1994), where a contractor fraudulently accelerated the payment by the government of $49,000 so that the contractor obtained that portion of the total amount (to which he was ultimately entitled) before the proper progress payment. The court held that because of early payment, the government suffered damages during the overpayment period, and thus was entitled to damages of three times the $49,000 premature payment. <u>Id</u>. at 1043. Thus it is immaterial whether the government ultimately entirely recouped its damages

by its $5.1 million settlement with Columbia University. <u>See also</u> <u>Visiting Nurse Ass'n of Brooklyn v. Thompson</u>, 378 F.Supp.2d 75, 98 (E.D.N.Y. 2004)("I find that even if the FCA contains an actual damages requirement, that component is satisfied where the government has paid out money in reliance upon the accuracy of a reimbursement claim, and only later recouped the overpayment.").

Nor is the fact that the dollar amount of the damages might be hard to calculate an obstacle to Relator's claim for statutory penalties. The entitlement to a penalty follows from the making of a false claim, not its amount. One who presents a false claim becomes liable for the civil penalty (regardless of the amount of the false claim), and so does one who conspires with the false claimant.

If there are difficulties of proof about the number of such claims – and hence the number of civil penalties – those are problems for trial, not for summary rejection of the claim.

Conclusion

All of the parties' other contentions have been considered. They do not alter the outcome.

Defendant's motion for summary judgment is denied, and Relator's motion is granted.

So ordered.

Dated: New York, New York
       April 6, 2006

                                                      /s/ Louis L. Stanton
                                                      LOUIS L. STANTON
                                                         U.S.D.J.